DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DENNIS CHARLES PEREZ,<br><br>Defendant. | Criminal Case No. 09-00025<br><br>**ORDER AND OPINION RE: MOTION TO ALLOW TRIAL TESTIMONY** |

The Government's Motion to Allow the Testimony of Martin Pablo came before this court for a hearing on January 6, 2011. At trial, the Government seeks the admission of Martin Pablo's live testimony and testimony concerning the ownership of a blue Silverado truck. *See* Docket No. 70. After hearing argument from counsel and reviewing the submissions, the court took the motion under advisement. For the reasons discussed more fully herein, the court **GRANTS** the motion in part and **DENIES** the motion in part.

## I. BACKGROUND

This case begins with a drug detection canine alerting to an express mail parcel which was mailed from Vancouver, Washington addressed to Bill Pablo, 177 David Gorton Street, Talofofo, Guam 96915, on May 6, 2009. It was later discovered that the sender of the package was a fictitious person, and the recipient, Bill Pablo was deceased. As a result on May 7, 2009, the parcel was searched pursuant to Magistrate Search Warrant Case No. 09-00024. Inside the parcel an Easter basket, assorted candy, and six plastic baggies surrounded by carbon paper were discovered. The plastic baggies contained approximately 39 gross grams of a crystalline

substance which field tested positive for methamphetamine.

The next day, on May 8, 2009, Drug Enforcement Agents ("DEA agents")[1] applied for a second warrant to place an electronic tracking device (referred hereafter as "beeper") in the package and to monitor that tracking device to the target residence and wherever else the package might travel until it was breached. Once the parcel was opened the beeper would emit a specific electronic signal. Notwithstanding their efforts, the DEA Agents inadvertently failed to obtain from the Magistrate Judge the actual written search warrant that would have authorized the installation of the beeper and the parcel's monitoring.[2]

On that same day, the agents also applied for an anticipatory warrant to search the residence at 177 David Gorton Street under the condition that the package be accepted at that residence. The Government claims that if the parcel was not taken to 177 David Gorton Street but rather was taken to another residence and breached, the explicit plan of the DEA agents was to enter and secure the second residence if exigent circumstances presented themselves. At the time that the Task Force Officer presented the warrant, the Magistrate Judge asked the officer to modify the portion of the warrant that applied to the anticipatory warrant to include the following language: "2. Or any other location where parcel is taken to and breached." *See* Docket No. 3 (MJ 09-00025).

On May 8, 2009, law enforcement agents placed 177 David Gorton Street under surveillance. At approximately 10:00 a.m., they observed a blue Silverado truck driven by the Defendant drive up to 177 David Gorton Street. The vehicle left, and then returned quickly when a postal carrier was approaching the home. Once the postal carrier arrived, Martin Pablo ("Pablo") got out of the passenger side of the vehicle and approached the mail carrier and signed

---

[1] For purposes of this order, any reference to "DEA agents" or "agents" is to include Guam Customs and Quarantine Agency Customs Officers assigned to the U.S. DEA Task Force.

[2] At a hearing held on September 18, 2009, the Magistrate Judge raised the issue of the Government's failure to obtain a search warrant order for the installation of the beeper and the parcel's monitoring. From the various hearings on the motions, the court understands that the agents may have been instructed to combine two warrants into one warrant, and in doing so, clerical errors were made.

for the package. The two men then walked toward the residence. Once the postal carrier left, the two men returned to the vehicle and drove to 302 North Paulino Heights, Talofofo. Law enforcement officers followed the blue Silverado and the electronic signal. Eventually, the Defendant pulled into a dead end street– North Pauliono Heights, to his residence, and the officers following proceeded past the street and then turned around.

Shortly thereafter, they detected the breaching of the package. They drove onto North Paulino Heights and parked in front of the Defendant's residence where the Defendant's blue Silverado was parked. Lieutenant Glenn Paulino ("Lt. Paulino"), of Guam Customs and Quarantine Agency, was parked across from the Defendant's residence. Pablo was observed standing outside in front of the blue Silverado that was parked adjacent to the right side of the house. Lt. Paulino and his partner approached Pablo and ordered him to get down, while the rest of the perimeter team secured the premises. Meanwhile, fearing the destruction of evidence, other officers entered the house and secured the residence. Once they confirmed the residence was empty, they secured the residence, then got a warrant to search the residence that afternoon. *See* Docket No. 2 (MJ 09-00026).

A few days later, on May 13, 2009, a federal grand jury indicted Defendant Dennis Perez (the "Defendant") with one count of Possession with Intent to Distribute Methamphetamine. *See* Docket No. 6. A federal grand jury superseded the indictment and charged the Defendant with Attempted Possession with Intent to Distribute Methamphetamine and Conspiracy to Distribute Methamphetamine. *See* Docket No. 19. The charges against the Defendant were based in part, on the evidence seized by law enforcement officers' use of the beeper. Thereafter, the Defendant filed two motions to suppress moving the court to suppress the physical evidence seized because the use of the beeper infringed upon Defendant's fourth amendment rights. *See* Docket Nos. 24 and 26.

The Magistrate Judge held hearings on the motions and then issued his Report and Recommendation. *See* Docket No. 49. On March 8, 2010, the Defendant filed his objections to the report. *See* Docket No. 56. On June 10, 2010, this court held a hearing on the objections. *See* Docket No. 65. However, instead of addressing the merits of the objections, the Government

attorney, Mr. Gerald Henderson ("Attorney Henderson"), raised a question concerning the preparations of the warrants. Rather than continue with the hearing, the court instructed Attorney Henderson to speak to his office as to how to proceed.

Thereafter, on June 25, 2010, the parties filed a stipulation. *See* Docket No. 68. They agreed that "the failure of offices to discover the defect in the search warrant, which did not include language authorizing the monitoring of a beeper in a private residence, constitutes a legal mistake as analyzed in *U.S. v. Song Ja Cha*, 597 F.3d 995 (9th Cir. 2010)." Docket 68, p.1. The parties further stipulated that "as a result of this error . . . all physical evidence seized from the residence at 302 North Paulino Heights, Talofofo, Guam is inadmissible." *Id.* Counsel agreed that the remaining issues before this court are the admissibility of the trial testimony of Pablo and testimony concerning the ownership of the blue Silverado truck. *Id.*

## II. DISCUSSION

### A. Testimony of Martin Pablo

#### 1. Fruit of the Poisonous Tree

For purposes of deciding the motion, the court accepts the parties' position that there was a Fourth Amendment violation that resulted in the suppression of evidence. The issue remains, however, whether the exclusionary rule should be applied to the trial testimony of Pablo.

Defense counsel argues that the trial testimony of the witness, Pablo, derives from the unlawful entry of the Defendant's residence, 302 North Paulino Heights, Talofofo. He contends the evidence must be excluded or suppressed as the "fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471, 488 (1963).

The exclusionary rule otherwise known as the "fruit of the poisonous tree" doctrine is a judicially created remedy that prohibits the government from introducing at the defendant's trial evidence of guilt obtained through violations of the Fourth Amendment. *See United States v. Leon*, 468 U.S. 897, 906 (1984). The genesis of the doctrine was addressed in *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920) where federal officers unlawfully seized certain documents from the Silverthornes. Following the district court's direction that the prosecutor return the seized documents, the prosecutor caused the grand jury to issue subpoenas

to the defendants to produce the very same documents that were returned. The defendants refused to produce them and were held in contempt. The Supreme Court, however, reversed, holding that the subpoenas were invalid. In its holding, the Court, per Justice Holmes, declared:

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed.

*Silverthorne,* 251 U.S. at 392.

According to this doctrine, not only is evidence illegally seized inadmissible, but any evidence or testimony obtained later as a result of the illegally seized evidence is inadmissible. *Wong Sun,* 371 U.S. at 484-88. If the "tree" is tainted, so too, are the "fruits." The court in *Calandra v. United States*, 414 U.S. 338, 348 (1974), explained that the rule is not "a personal constitutional right." Its "purpose . . . is not to redress the injury to the privacy of the search victim: '[T]he ruptured privacy of the victims homes and effects cannot be restored. Reparation comes too late.' " *Id.* at 347 (quoting *Linkletter v. Walker*, 381 U.S. 618, 637 (1963)). Rather, the doctrine "is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *See Elkins v. United States*, 364 U.S. 206, 217 (1960) ("The rule is calculated to prevent, not to repair. Its purpose is to deter-to compel respect for the constitutional guaranty in the only effectively available way-by removing the incentive to disregard it.").

The rule oftentimes excludes evidence that is quite reliable. The Supreme Court has provided the following justification for extending the exclusionary rule to fruits of the poisonous tree:

> The core rationale consistently advanced by this Court for extending the exclusionary rule to evidence that is the fruit of unlawful police conduct has been that this admittedly drastic and socially costly course is needed to deter police from violations of constitutional and statutory protections. This Court has accepted the argument that the way to ensure such protections is to exclude evidence seized as a result of such violations notwithstanding the high social cost of letting persons obviously guilty go unpunished for their crimes. On this rationale, the prosecution is not to be put in a better position than it would have been in if no illegality had transpired.

*Nix v. United States*, 467 U.S. 431, 442-43 (1984).

Where, as here, a defendant's Fourth Amendment rights were violated, the only relevant question in determining whether evidence is fruit of the poisonous tree and therefore subject to the exclusionary rule is "whether, granting establishment of the primary illegality, the evidence to which the instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488 (citations and quotations omitted).

The Supreme Court has recognized three exceptions to the "fruit of the poisonous tree" doctrine. "These three exceptions are the 'attenuated basis' exception, the 'independent source' exception, and the 'inevitable discovery' exception." *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1396 (9th Cir. 1982). Although the three exceptions to the doctrine developed separately, they are closely linked to one another. As the Fifth Circuit noted, the three exceptions converge to a certain extent, as in each case "[t]he core inquiry is whether the police would have discovered the evidence if the misconduct had not occurred." *United States v. Namer*, 835 F.2d 1084, 1087 (5th Cir.), *cert. denied*, 486 U.S. 1006 (1988). In this case, the Government argued that the testimony of Pablo would be admissible under either the attenuated theory or the inevitable discovery exception.

### a. Attenuated Basis

An exception to the "tainted fruit" doctrine has been established for the case where the connection between the illegal seizure and the subsequent discovery of the challenged evidence has "become so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341 (1939). In *Nardone*, federal officers obtained information through illegal wiretapping. While the wiretapped conversations themselves were not received in evidence, the defendant, following his conviction, sought to examine the prosecution on the uses to which it had put the information gained through the wiretapping. The lower courts rejected the effort, but the Supreme Court reversed, holding that "[t]o forbid the direct use of [unlawful] methods . . . but to put no curb on their full indirect use would only invite the very methods deemed 'inconsistent with ethical standards and destructive of personal liberty.'" 308 U.S. at 340 (quoting *Nardone,* 302 at 384).

Nevertheless, the Court made clear that a "but for" causal connection between law enforcement misconduct and trial evidence would not necessarily suffice to warrant exclusion of evidence. It endorsed *Silverthorne's* statement that the facts obtained by an illegal search do not thereby become "sacred and inaccessible" adding that:

> Sophisticated argument may prove a causal connection between information obtained through illicit wire-tapping and the Government's proof. As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint.

*Id.* at 341.

In considering whether there is dissipation of the taint, courts must attempt to "mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." *Brown v. Illinois*, 422 U.S. 590, 609 (1975). "[A]t *some* point along the line, evidence might be 'fruit,' yet nonetheless be admissible because it is no longer 'tainted" or 'poisonous.' Of course, the line between 'taint' and 'attenuation' is not an easy one to draw." *United States v. Smith*, 155 F.3d 1051, 1060 (9th Cir. 1998).

The standard for suppression under the "attenuated basis" exception is slightly different when the evidence sought to be suppressed is testimonial, rather than documentary. *See United States v. Ceccolini*, 435 U.S. 268, 278 (1978). In *Ceccolini* the Supreme Court set out the factors that should be considered in applying the attenuated basis exception to live-witness testimony and focused on two themes.[3] First, the Court recognized that live witnesses willing to testify of

---

[3] In *Ceccolini*, Ron Biro, a uniformed police officer was on assignment to patrol school crossings. He entered the defendant's place of business to visit his friend, Lois Hennessy, an employee of the defendant's. While engaged in conversation with Hennessy, Biro noticed an envelope with money sticking out of it lying on the drawer of the cash register behind the counter. He asked her to whom the envelope belonged, and was told that it belonged to her employer, Ceccolini, and that she was instructed to give it to someone. Officer Biro passed this information along to the FBI, which had been investigating area gambling operations for some time. Among the establishments under surveillance was Ceccolini's business. Four months later, an FBI agent contacted Hennessy and interviewed her at her home. Without referring to Biro's search, the agent asked Hennessy for information regarding the activities of Ceccolini. She stated that she was studying police science in college and would be willing to help. Thereafter she testified before a grand jury, which indicted Ceccolini for perjury. Hennessy testified at Ceccolini's trial, but after a

- 7 -

their free will can dissipate the taint. The Court explained that

> Witnesses are not like guns or documents which remain hidden from view until one turns over a sofa or opens a filing cabinet. Witnesses can, and often do, come forward and offer evidence entirely of their own volition. And evaluated properly, the degree of free will necessary to dissipate the taint will very likely be found more often in the case of live-witness testimony than other kinds of evidence. The time, place and manner of the initial questioning of the witness may be such that any statements are truly the product of detached reflection and a desire to be cooperative on the part of the witness. And the illegality which led to the discovery of the witness very often will not play any meaningful part in the witness' willingness to testify.

*Id.* at 276-277.

Second, the Court was concerned that the costs of excluding live-witness testimony may be greater than the deterrent effect. It noted that exclusion would "perpetually disable" a willing witness from testifying about material facts, an enormous cost in light of the fact that police rarely conduct illegal searches in order to discover witnesses. *Id*. at 277. Therefore, when the challenge concerns live-witness testimony, "a closer, more direct link between the illegality and that kind of testimony is required." *Id.* at 278. The exception is applied more generously when the challenged derivative evidence is live-witness testimony than when it is documentary evidence. With these principles in mind, the court turns to the disputed evidence in this case.

Here, the Government argues that with respect to the trial testimony of Pablo, it is sufficiently attenuated to the illegal search of the Defendant's home. *See United States v. Kandik*, 633 F.2d 1334, 1335 (9th Cir. 1980) (stating defendant "has the initial burden of establishing a factual nexus between the illegality and the challenged evidence," but the government "must prove that the particular evidence or testimony is not fruit of the poisonous tree."). The court notes that Pablo was arrested on May 8, 2009. However, the testimony the Government seeks to introduce at trial, which is set forth in Pablo's plea agreement, was provided months later, after he had the advice of an attorney, and had made a reasoned decision

///

---

finding of guilt, the trial court granted Ceccolini's motion to suppress her testimony, and set aside the verdict. The court of appeals affirmed, but the Supreme Court reversed, holding that Hennessy's testimony was admissible under the attenuated basis exception.

- 8 -

to cooperate with the Government.[4] In entering his plea, Pablo represented that he did so under his own volition. There has been no indication that the Government exercised any control over his decision. If Pablo had been motivated to avoid prosecution, he could have waited for a suppression ruling in the Defendant's case or challenged the admissibility of the evidence against him in his own criminal case. Pablo entered his guilty plea without doing either of these. Moreover, there is no indication that the illegal search of the Defendant's home would have made any difference in terms of Pablo's assessment of the strengths or weaknesses of the Government's case against him and his willingness to enter a plea.[5] The Government already had discovered his identity and knew that drugs were being mailed to his residence.

In sum, the balance of factors suggests that Pablo's testimony is not the kind of "tainted fruit" envisioned by *Ceccolini* as warranting suppression. This is not a case where Pablo was "discovered as a direct result of the illegal search, [or was] implicated thereby in illegal activity." *Ramirez-Sandoval*, 872 F.2d at 1398 (*quoting United States v. Rubalcava-Montoya*, 597 F.2d 140, 143 (9th Cir. 1978). Nor can it be said that his cooperation was inextricably linked to the Government's unlawful search of the Defendant's residence. The court is satisfied that Pablo's cooperation and agreement to testify at the Defendant's trial resulted from an exercise of Pablo's free will, and was the "product of detached reflection and a desire to be cooperative."[6] *Ceccolini*, 435 U.S. at 277. Moreover, because the costs of excluding this live-witness testimony would greatly outweigh the marginal deterrent effect, we find that the relationship between the unlawful seizure and Pablo's cooperation is so attenuated as to dissipate the taint. Accordingly, Pablo's testimony is admissible.

### b. Inevitable Discovery

---

[4] Counsel for Pablo signed the plea agreement on October 1, 2009, almost five months after his arrest in *United States v. Martin R. Pablo*, Crim. Case No. 09-00047. *See* Docket No. 2.

[5] While the parties agree that certain evidence is to be suppressed as to the Defendant, it is not necessarily true that that evidence would be suppressed as to Pablo.

[6] In entering his plea of guilt, Pablo also understood that his cooperation against the Defendant could result in a more lenient sentence.

The Government also argues that discovering Pablo's identity and the confrontation with him was inevitable. The Supreme Court examined the "inevitable discovery" exception to the "fruit of the poisonous tree" doctrine in *Nix v. United States*, 467 U.S. 431, 444 (1984). Under this exception, when the Government demonstrates by a preponderance of the evidence that the tainted evidence would inevitably have been discovered through lawful means, that evidence need not be suppressed. *Id., see also United States v. Boatwright*, 822 F.2d 862, 864-65 (9th Cir. 1987) (This "doctrine requires that the fact or likelihood that makes the discovery inevitable arise from circumstances other than those disclosed by the illegal search itself." ). "The government can meet its burden by establishing that, by following routine procedures, the police would inevitably have uncovered the evidence." *Ramirez-Sandoval*, 872 F.2d at 1399.

The Government asserts that it would have inevitably discovered the identity of Pablo. The court agrees. The nexus between the illegal search and challenged evidence is one of common sense, to be considered under the facts and circumstances of the particular case. *See Nardone*, 308 U.S. at 341. It is undisputed that the agents knew the identity of Pablo before the illegal search of the Defendant's premises and had some basis to suspect his involvement in the very crime in which he was charged. The drugs in question were in a parcel addressed to Pablo's home under the name of Pablo's deceased brother. On the day the parcel was delivered, Pablo was observed waiting outside his house in the Defendant's truck. They circled the area in the truck returning to Pablo's residence to retrieve the parcel when they saw the postal carrier. Pablo signed for the parcel and then got back into the truck and left with the Defendant. The men were followed to a dead end street. The police prepared to wait on a cross road for either the parcel to be opened, time to pass or for the blue Silverado to leave the area.

The illegality of the monitored parcel did not result in the discovery of Pablo as a potential witness, nor did it create probable cause for his arrest or the reason for his cooperation. The monitoring of the packaged caused the timing of the arrest and revealed the fact the parcel had been opened. The monitoring of the beeper resulted in the timing of the confrontation, but absent the device, the confrontation was inevitable. The officers were going to apprehend Pablo. In short, the Fourth Amendment violation in this case yielded nothing of evidentiary value that

- 10 -

1 the agents did not already have in their grasp.

2 Moreover, the exclusion of Pablo's testimony that would inevitably been discovered adds nothing to either the integrity or fairness of the Defendant's criminal trial. Application of the exclusionary rule "has been restricted to those instances where its remedial objectives are thought most efficaciously served." *Arizona v. Evans*, 514 U.S. 1, 11 (1995). To trigger the "exclusionary rule," which prohibits introduction of evidence, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by justice system.

### 2. Standing[7]

The Government also argues that the issue the court should address is whether the Defendant even has standing to challenge the legality of the arrest of Pablo and the fruits of that arrest. The court finds the Government's argument misguided. The Defendant is not seeking to suppress the testimony of Pablo based upon any violation of Pablo's rights. Instead, he is seeking to suppress the derivative evidence that was seized by the agents in violation of his own Fourth Amendment rights– namely the testimony of Pablo. "Standing to invoke the exclusionary rule has been found to exist only when the Government attempts to use illegally obtained evidence to incriminate the victim of the illegal search." *Stone v. Powell*, 428 U.S. 465, 488 (1976). The cases cited to by the Government are inapposite because they all concern defendants who suffered no constitutional violation of their own, unlike the situation here. *See* Docket No.

---

[7] The Government's motion was filed by Attorney Henderson who is no longer employed with the U.S. Attorney's office. Docket No. 70. Attorney Karon Johnson ("Attorney Johnson") assumed responsibility for the prosecution of this case. On September 17, 2010, she filed a supplemental memorandum. Docket No. 76. Therein she states that the other briefs filed in this case are not on point, in particular the cases cited by Attorney Henderson, in his analysis of the "fruit of the poisonous tree." Attorney Johnson claims that the cases cited by Attorney Henderson concern the admissibility of a witness' statement or testimony. They are predicated on an illegal search of property in which the defendant had a Fourth Amendment interest and legitimate expectation of privacy in the thing or placed searched, unlike the situation here. The court notes, however, that at the hearings Attorney Johnson seemed to retreat from her position as stated in her supplemental brief. While she still argued that standing was an issue, she also made arguments concerning the exceptions to the "fruit of the poisonous tree" doctrine.

76. In *Wong Sun,* 371 U.S. 471, two defendants were prosecuted for transporting heroin: Wong Sun and James Wah Toy ("Toy"). FBI agents had confronted Toy about possessing heroin; he said he had none, but that Johnny Yee ("Yee") had some. *Id* at 474-75. Agents went to Yee's house and recovered several tubes of heroin. *Id.* at 475. Yee said he had received the heroin from Toy and Wong Sun. *Id.* All three men were charged; this case concerns the convictions of Wong and Toy based upon the heroin found at Yee's. The Court held that Toy's arrest was illegal and thus the statements he made to agents in his home had to be suppressed. *Id.* at 479.

Because the heroin at Yee's was discovered as a direct exploitation of Toy's illegal statements, it was "fruit of the poisonous tree," and could not be used against Toy. *Id*. at 488. However, the evidence could be used against defendant Wong Sun.

> Our holding, supra, that this ounce of heroin was inadmissible against Toy does not compel a like result with respect to Wong Sun. The exclusion of the narcotics as to Toy was required solely by their tainted relationship to information unlawfully obtained from Toy, and not by any official impropriety connected with their surrender by Yee. **The seizure of this heroin invaded no right of privacy of person or premises which would entitle Wong Sun to object to its use at his trial**.

*Id.* at 491- 492 (emphasis added).

In *Dearinger v. Rhay*, 421 F.2d 1086 (9th Cir. 1970), the defendant's friend, Bobbit, accompanied by another friend, Miller, picked him up at his house and drove away. *Id.* at 1087. Eight blocks later, officers stopped Bobbit's car for a traffic violation and took Miller away to jail. *Id.* There, Miller told officers that he had seen narcotics at the defendant's home shortly before their arrest. *Id.* Based on Miller's statement, police got a search warrant, found narcotics in a sock thrown from the house during the search, and charged the defendant with possession. *Id.*

Dearinger attacked the validity of the search warrant, alleging that the traffic stop was illegal, Miller's arrest was illegal, Miller's statements were illegally obtained, and therefore the fruit of any search warrant based upon Miller's statements had to be suppressed. *Id.* The court affirmed his conviction, holding that Dearinger did not have standing to question the legality of Miller's arrest. ""[W]e hold that if Miller's arrest was illegal, such illegality did not violate any right of Dearinger. He therefore does not have standing to urge the illegality of Miller' arrest,

- 12 -

1  and the 'poisonous fruit' thereof, as a ground for challenging the warrant to search his home." *Id*.
2  at 1088.

3  In *United States v. Baker*, 256 F.3d 855 (9th Cir. 2001), defendant and a codefendant
4  were questioned outside a Federal Express office after they sent a package to Alabama. *Id.* at
5  858. Defendant took off running; his confederate was arrested and $6,000 was seized from her
6  purse. *Id.* Based on the items in her purse, a search warrant was obtained for the package,
7  which was found to contain almost 5,660 grams of cocaine base. *Id.* Both filed motions to
8  suppress which were denied, and both were convicted. On appeal, however, the codefendant's
9  arrest was found to be illegal and the evidence of the cocaine base was suppressed as to her. *Id.*
10 In defendant's § 2255 petition, he alleged his counsel had been incompetent in part because he
11 failed to challenge the admission of the cash found in the codefendant's purse or the validity of
12 the subsequent search warrant as to him. *Id.* at 862. The court affirmed his conviction: the first
13 two grounds of appeal "would have been unsuccessful under basic Fourth Amendment doctrine
14 because [the defendant] did not have standing to challenge the search of [the confederate's]
15 purse and the admission of the money found in it."*Id.* at 863, (*citing Rakas V. Illinois*, 439 U.S.
16 128 (1978)).

17 As noted, unlike the defendants in the cases cited to by the Government, the Defendant
18 here had his Fourth Amendment rights violated. Therefore, the Defendant indeed has standing to
19 object to any indirect evidence obtained as a result of that primary illegality.

20 **B.    The Blue Silverado Truck**

21 In the Government's motion, it moved the court to allow it to present "testimony
22 concerning the ownership of the blue Silverado truck." *See* Docket No. 70, p. 1:18-19.
23 However, without deciding whether such testimony should be admitted or excluded, the court
24 finds the matter moot. At the hearing held on January 3, 2010, the Government attorney
25 informed the court that she no longer wished to pursue the issue of ownership.

26     Counsel:      If I understand the procedure of the case right now is that counsel
                           wants to suppress the testimony of Mr. Pablo and I think that is the
27                            only issue before the court, am I correct on that?
    Court:         Why I think there is, yeah there is a request to, allow the
28                            testimony, you want the testimony of Martin Pablo to come in.

| | | |
|---|---|---|
| Counsel | | Absolutely, call him as a witness. |
| Court: | | And the testimony concerning the ownership of the Blue Silverado truck. |
| Counsel: | | Well actually, I don't care about that. |
| Court: | | Ok ok strike that. |
| Counsel: | | Yeah, let's strike that. |
| Court: | | Ok. |
| Counsel: | | As a practical matter it could belong to somebody's mother in-law, as long as you are driving it who cares. |

The court understands that the Government attorney now handling the trial is not the same attorney who filed the instant motion. For whatever the reason, the court will not speculate as to reason for the difference of opinion other than to note that the court was inclined to grant the Government's motion in this regard had it argued for its admission.

## C. Photographs

At the hearing on the motion, Government counsel indicated that at trial, she would seek to admit photographs of evidence strewn in the Defendant's backyard. As previously noted, the Defendant clearly had a legitimate expectation of privacy in his residence which included his home, carport, and within the curtilage of his residence. Moreover, the Government has already conceded that there was a violation of the Defendant's Fourth Amendment rights and agreed to exclude all physical evidence seized *from* the Defendant's residence. *See* Docket No. 68. The Government now states that the agreement only concerned the suppression of the actual physical evidence that was actually seized, and not photographs that were taken of evidence that laid outside the curtilage of the Defendant's residence. Defense counsel points out that Government counsel's interpretation is contrary to his understanding. He insists that pictures of evidence taken from the residence is also subject to suppression under their agreement.

It is clear that the parties each have their own interpretation of what constitutes evidence seized "from" the residence. When, however, there is ambiguity regarding contract interpretation in the criminal context, it should be construed in favor of the defendant. The Ninth

Circuit has held that "construing ambiguities in favor of the defendant makes sense in light of the parties' respective bargaining power and expertise." *United States v. Transfiguracion*, 442 F.3d 1222, 1228 (9th Cir. 2006) (stating that "the government is usually the drafter and must bear responsibility for the lack of clarity.").

Here, construing the ambiguity in favor of the Defendant, the court finds the admission of photographs of evidence seized from the premises impermissibly violates the conditions of its agreement with the Defendant. Accordingly, the court suppresses all tangible evidence, to include photographs of evidence taken in, around or at the Defendant's premises. This result is in conformity with the principle that the "fruit of the poisonous tree" doctrine is one flowing from the personal Constitutional rights of the Defendant whose privacy rights were violated.

### III. CONCLUSION

For the foregoing reasons, the court finds that the testimony of Pablo is sufficiently attenuated to the illegal search of the Defendant's residence to justify its admission. Accordingly, the court **HEREBY GRANTS** the Motion to Allow the testimony of Martin Pablo. However, the court **DENIES** the motion with respect to the testimony concerning the ownership of the blue Silverado. Since the Government no longer intends to introduce that evidence the matter is considered moot.

Lastly, the court schedules this matter for pretrial conference on March 29, 2011 at 9:30 a.m. and schedules the trial for April 12, 2011 at 9:30 a.m. All trial documents shall be filed by March 29, 2011.

**/s/ Frances M. Tydingco-Gatewood**
**Chief Judge**
**Dated: Feb 25, 2011**